

FILED
2018 Jan-03  PM 04:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

ELECTRONICALLY FILED
12/1/2017 1:48 PM
01-CV-2017-905050.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case 01<br><br>Date of Filing:   Judge Code:<br>12/01/2017 |
|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
### DOROTHY JONES v. BANK OF AMERICA

**First Plaintiff:** ☐ Business  ☑ Individual  ☐ Government  ☐ Other

**First Defendant:** ☑ Business  ☐ Individual  ☐ Government  ☐ Other

---

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☑ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other:_____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Properly

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/ Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

---

**ORIGIN:**  F ☑ INITIAL FILING    A ☐ APPEAL FROM DISTRICT COURT    O ☐ OTHER

R ☐ REMANDED    T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

---

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO    **Note:** Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

---

**RELIEF REQUESTED:**    ☑ MONETARY AWARD REQUESTED    ☐ NO MONETARY AWARD REQUESTED

---

**ATTORNEY CODE:**

AUG001

12/1/2017 1:48:11 PM
Date

/s/ JOSEPH H. AUGHTMAN
Signature of Attorney/Party filing this form

---

**MEDIATION REQUESTED:**    ☐ YES ☑ NO ☐ UNDECIDED

ELECTRONICALLY FILED
2017 1:48 PM
01-CV-2017-905050.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| DOROTHY JONES, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :  Civil Action No.: |
| | : |
| | : |
| BANK OF AMERICA, N.A., | : |
| And Fictitious Defendants A, B and C, | : |
| who are the person(s) or entities who are | : |
| responsible by law for the matters alleged | : |
| herein, whose true and correct names are | : |
| unknown at this time but will be | : |
| substituted by amendment when | : |
| ascertained, | : |
| | : |
| Defendants. | |

NOW COMES the Plaintiff, by and through undersigned counsel, files this amended complaint against Defendant, Bank of America, N.A. as follows:

### PARTIES

1.  Plaintiff is an individual over the age of 19 that is a citizen of Jefferson County, Alabama, residing at 6904 Court North, Birmingham, AL 35228.

2.  Defendant, Bank of America, N.A. (hereinafter "BOA"), is a Delaware Corporation, with its principal office address located at 101 S. Tryon Street, Charlotte, North Carolina.

### JURISDICTION AND VENUE

3.  The Court has jurisdiction pursuant to *Code of Alabama* 1975 § 12-11-30.

4.      Personal jurisdiction over Defendant is proper because this action arises out of or relates to Defendant's contacts with Alabama, and because there are sufficient minimum contacts between Alabama and Defendant.

5.      Venue is proper in this Court because the Plaintiff resides in Jefferson County, Alabama, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Jefferson County, Alabama.  The real property associated with the mortgage and note are located in Jefferson County, Alabama.  The events outlined in this Complaint occurred in Jefferson County, Alabama.

6.      The Plaintiff brings her claims solely under Alabama law.

## GENERAL FACTUAL ALLEGATIONS

7.      The Complaint chronicles the pervasive fraud exacted by BOA on homeowners seeking Home Affordable Modification Program ("HAMP") modifications.  Plaintiff was a victim of this fraud.

8.      In late 2008 and early 2009, the United States Government provided a total of $45 billion dollars to BOA pursuant to the Troubled Asset Relief Program ("TARP").  It also extended to BOA an additional guarantee of over $100 billion dollars.  Having concluded that the costs of allowing BOA to fail were too high, the U.S. Government decided taxpayers would save the life of BOA, and they did.[1]

9.      As the Congressional Oversight Panel ("Panel") described it, "almost overnight" U.S. taxpayers provided to several large financial institutions, including BOA, an infusion of over

---

[1] United States Department · of Treasury, Troubled Asset Relief Program Transactions Report, ("Treasury Transaction Report"), available at: https://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx

$200 billion dollars.[2]  This massive bailout allowed the continued existence of several institutions including BOA.

### BOA Agrees to the Home Affordable Modification Program ("HAMP") in Exchange for Billions from Taxpayers

10.     Because the stated purpose of the financial bailout was to help the American people and homeowners in particular, HAMP was implemented in March of 2009 to assist the millions of American homeowners facing foreclosure.

11.     Knowing all eyes were on it, and on the billions of dollars it had been given by the government, on April 17, 2009, BOA, the nation's largest mortgage servicer, signed a "Servicer Participation Agreement" (the "Agreement" or "HAMP Agreement") with the Federal Government requiring it to use "reasonable efforts" to "effectuate any modification of a mortgage loan under the Program." *See* **Exhibit 1** at Sec. 2A.

12.     BOA signed this Agreement in exchange for a commitment by the Federal Government to provide BOA hundreds of millions of taxpayer dollars for its promise and obligation to comprehensively provide HAMP screening for all homeowners serviced by BOA.[3]

13.     Once approved for HAMP modification, a homeowner who agrees to participate typically begins a three-month Trial Payment Period during which mortgage payments are made under the terms of the modification.  If timely payments are made during those three months (i. e., not more than 30 days overdue during any month), the homeowner must be offered a permanent modification, with the terms in effect during the Trial Payment Period extended for 5 years.

---

[2] Congressional Oversight Panel, The Final Report of the Congressional Oversight Panel, March 16, 2011, ("Final Report"), available at http://www.senate.gov/general/common/generic/COP_redirect.htm.
[3] Treasury Transaction Report at 27.

14.     After a homeowner completes a period of 5 years under the terms of the modification, lenders may increase the interest rate on the loan by 1% annually up to the prevailing Freddie Mac interest rate at the time the modification was made.

15.     The Agreement indicates that BOA "shall perform the services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party," and "shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third-party consents and waivers that are required, by contract or in law, in order to effectuate any modification of a mortgage loan under the Program." *See* **Exhibit 1** at Sec. 2A.    Servicers, including BOA, received incentive payments to complete HAMP modifications and in March 2010, the incentive was increased to $2,000.00.

**BOA Develops and Orchestrates a Fraudulent Scheme to Avoid
the Requirements of HAMP in Order to Increase Profits**

16.     Despite signing the Agreement and accepting billions of dollars, BOA knew conforming to the requirements of the Agreement in providing screening for HAMP applications and accepting homeowners who meet the requirements would cost the bank millions of dollars.

17.     For that reason, instead of honoring its contract with the Federal Government to, in good faith, help as many distressed homeowners as possible, it made a calculated decision.   BOA decided to permit just enough HAMP modifications to occur to create a defense (however untenable) against Federal Government agencies, Congressional skeptics and the public that it was making best efforts to comply with its Agreement.   Simultaneously, however, BOA chose to develop methodical business practices designed to intentionally prevent scores of eligible homeowners from becoming eligible or staying eligible for a permanent HAMP modification.

18.     BOA and its agents never properly hired, trained, or equipped a workforce to genuinely address the scores of homeowner complaints and regulatory inquiries, and instead

developed systems and procedures that deliberately obfuscated, misled, and otherwise deceived those homeowners and regulators, resulting in ineligibility through no fault of the homeowner.

19.     To achieve the goal of frustrating HAMP applications, BOA contracted with Urban Lending Solutions, ("Urban") to handle a variety of services relating to its participation in HAMP under the Agreement.

20.     Urban is a privately held company based in Pittsburgh, providing services to the mortgage industry.   On its website, Urban indicates it is an industry leader in providing "a wide variety of outsourced services to its clients including mortgage fulfillment services, home retention solutions, appraisals and valuation services, title and settlement services, document fulfillment, call center and collection services."

21.     However, the processes and procedures employed by BOA and Urban were diametrically opposed to the intent and purpose of HAMP, and Urban agreed and conspired to frustrate HAMP applicants.

22.     As part of its complex scheme to defraud the Federal Government and taxpayers, BOA hired temp workers and folded Urban employees into its HAMP operations and gave these employees misleading BOA titles.  To the outside world of homeowners and regulators, Urban's workforce appeared indistinguishable from BOA's own employees.

23.     BOA used this workforce to solicit and direct homeowners to return documents, via FedEx to Urban, which received hundreds of thousands of FedEx packages from prospective HAMP participants.  Urban hired scores of employees to accept and scan millions of pages of original documents, including homeowner financials, to be saved on the Urban Portal. Unfortunately for homeowners, as explained in this Complaint and declarations by former BOA employees, this repository was designed as a black hole for their documents.

**Former BOA Employees Sign Sworn Declarations**
**Outlining the Fraudulent HAMP Scheme**

24.     According to the February 22, 2017 Declaration of Rodrigo Heinle, (**Exhibit 2**)

who worked for BOA in Charlotte, North Carolina from 2011 through 2012:

    a.  Bank of America employed a common strategy of delaying HAMP applications. Delay was achieved using tactics including claiming that documents were incomplete and/or missing when they were not, or simply claiming files were "under review" when they were not.

    b.  Homeowner applications were routinely shredded with no review by Bank of America and at times taken home by managers in order to conceal the fact they had been received by Bank of America.

    c.  Upon the instruction of my manager Jamal Brown, and other managers, I deleted thousands of homeowner HAMP application files from Bank of America computer databases, as many as six thousand (6,000) in one day.

25.     According to the June 5, 2013 Declaration of William E. Wilson, Jr., (**Exhibit 3**)

who worked for BOA in Charlotte, North Carolina from 2010 through 2012:

    a.  Individual BOA employees were given "approximately 400 HAMP files" at any given time.

    b.  "Though BOA required that applicants immediately provide financial documents, often on short notice, the bank intentionally allowed these documents to sit for months without ever reviewing them."

    c.  Bank of America instructed its employees to employ a common strategy of delaying HAMP applications, "claiming that documents were incomplete or missing when they were not, or simply claiming the file was ''under review' when it was not." This delay tactic allowed BOA to falsely claim homeowners had not provided the required documentation when in fact, the homeowner had sent in documents months earlier, often multiple times, and had made payments under a Trial Payment Period plan, but had not gotten a permanent modification or even a decision regarding their modification.

    d.  Next, BOA regularly employed a procedure called a "blitz." "Approximately twice a month, BOA ordered case managers and underwriters to 'clean out' the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old. These included files in which the homeowner had provided all required financial documents and fully complied with the terms of a Trial Period Plan" and were entitled to a HAMP modification.

e. "During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than that the documents were more than 60 days old. BOA instructed its employees to enter into its computer systems a reason that would justify declining the modification to the Treasury Department.  The justifications commonly included claiming that the homeowner had failed to return requested documents or had failed to make payments. In reality, these justifications were untrue."

f. The "homeowners, who did not receive the permanent HAMP modification they were entitled to, ultimately lost their homes to foreclosure."

26.     According to the May 23, 2013 Declaration of former BOA Senior Collector of

Loss Mitigation employee, Simone Gordon (**Exhibit 4**):

a. Employees were given quotas for placing a specific number of accounts into foreclosure, including accounts in which the borrower fulfilled a HAMP Trial Period Plan.  Employees who met quotas for placing "ten or more accounts into foreclosure in a given month received a $500 bonus.  Bank of America also gave employees gift cards to retail stores like Target or Bed Bath and Beyond as rewards for placing accounts into foreclosure."

b. And that Employees were closely monitored by BOA "Team Leaders and Site Leaders who walked the call room floor throughout the day wearing headsets that they would use to plug in and listen into a call without warning.  Employees who were caught not carrying out the delay strategies that BOA instituted were subject to discipline and termination."

c. "Employees who were caught admitting that BOA had received financial documents or that the borrower was actually entitled to a permanent loan modification were disciplined and often terminated without warning."

27.     According to the May 15, 2013 Declaration of former BOA collection employee,

Theresa Terrelonge (**Exhibit 5**):

a. BOA "was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP. It was well known among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible."

b. BOA employees "were called into group meetings with our supervisors on a regular basis. The information we received in group meetings showed me that Bank of America's deliberate practice was to string homeowners along with no intention of

providing permanent modifications. We were instructed to inform every homeowner who called in that their file was "under review" - even where the computer system showed that the file had not been accessed in months or when the homeowner had been rejected for a modification."

c. BOA employees "were instructed to inform homeowners that modification documents were not received on time, not received at all, or that documents were missing, even when, in fact, all documents were received in full and on time."

d. She "witnessed employees and managers change and falsify information in the systems of record, and remove documents from homeowners' files to make the account appear ineligible for a loan modification. This included falsifying electronic records so that the records would no longer show that the homeowner had sent in required documents or had made required payments. This was done so that the file could be closed, the homeowner's effort to obtain a loan modification could be rejected, and the manager could meet Bank of America's production goal for the given week or month."

e. She also observed that "Bank of America often avoided extending HAMP modifications by sending non- HAMP modifications to homeowners who had applied for a HAMP modification. These non- HAMP modifications were typically on worse terms for the homeowner than what they were eligible to receive under HAMP - but they were at higher interest rates and more profitable for Bank of America. I fielded dozens of calls from homeowners who had waited months for a HAMP modification and were confused, and often in tears, when they received a modification that appeared nothing like what they were led to expect."

28.   According to the May 13, 2013 Declaration of former BOA underwriter Steven

Cupples (**Exhibit 6**):

a. "Bank of America retained outside vendors to manage the documents being sent to and received from borrowers applying for HAMP modifications. Urban Lending Solutions was one of the vendors tasked to receive and upload financial documents from borrowers."  Mr. Cupples "quickly realized that if the loan had documents that were sent to Urban, those documents would be scattered over various links in the computer systems. The documents were present, but they often could not be viewed using a single system. An underwriter would need to know to go to other systems such as IPORTAL, LMA, LMF, or HomeSaver to review documents the borrower had sent. Most underwriters did not know that they needed to look for documents in multiple systems and often assumed documents had not been sent. As a result, many borrowers were declined loan modifications they should have received.

b.  Mr. Cupples "observed that Bank of America reported to the Treasury Department and made public statements regarding the volume of loans it was successfully

modifying, and the efforts it was making to catch up with the volume.  Often this involved double counting loans that were in different stages of the modification process. It also involved counting loans that were entitled to modifications as having been modified - only to foreclose on those same loans later. It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true."

### The Results of BOA's Fraudulent Scheme

29.     BOA's fraudulent scheme worked as intended. A January 27, 2017 Inspector General Report to Congress found BOA "[w]rongfully denying homeowners admission into HAMP" and "denied 79% of all who applied for HAMP" concluding in its report to Congress that "[t]her should be unacceptable given that Bank of America has already received about $2 billion from [the] Treasury for HAMP." **Exhibit 7**.

### U.S. Department of Justice Sues BOA for the Fraudulent HAMP Scheme

30.     Servicers, including BOA received incentive payments to complete HAMP modifications and in March 2010, the incentive was increased to $2,000.00. Accordingly, the incentive for BOA to fraudulently report completed HAMP modifications is clear.

31.     In a lawsuit by the Federal Government against BOA in the Eastern District of New York, initiated by a whistleblower, BOA agreed to pay back $1 billion under the Federal False Claims Act.  *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.) The August 2014 settlement also included BOA agreeing to "pay $7 billion in relief to struggling homeowners, borrowers and communities affected by the bank's conduct."[4]

### Class Action Claims Denied in Favor of Individual Claims

32.     The Multi District Litigation case *In re Bank of America Home Affordable*

---

[4] August 21, 2014 U.S Justice Department News Release dated August 21, 2014. ("Justice Department News Release"), available at https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department settlement-financial-fraud-leading

*Modification Program (HAMP) Contract Litigation*, M.D.L. No. 10–2193–RWZ was filed in 2011 and included class action cases from across the country.  In denying class certification of the multi-district class, the Massachusetts District Court concluded:

> This case demonstrates the vast frustration that many Americans have felt over the mismanagement of the HAMP modification process. Plaintiff have plausibly alleged that Bank of America utterly failed to administer its HAMP modifications in a timely and efficient way; that in many cases it lost documents, or pretended it had not received them, or arbitrarily denied permanent modifications. *See* Third Am. Compl., ¶¶ 135–473 (describing the different experiences of each named plaintiff). Plaintiff's claims may well be meritorious; but they rest on so many individual factual questions that they cannot sensibly be adjudicated on a classwide basis. Because plaintiff have failed to meet the predominance and superiority requirements of Rule 23(b)(3), their motion for class certification (Docket # 208) is DENIED. *Goldman v. Bank of America, NA, et al.*, 2013 WL 4759649. **Exhibit 8.**

33.    It is now up to individual borrowers to file individual lawsuits to recover damages resulting from the systematic fraudulent practices of BOA with regard to HAMP.

## FACTUAL ALLEGATIONS OF
## PLAINTIFF DOROTHY JONES

34.    Plaintiff is a citizen of Jefferson County, Alabama, residing at 6904 Court N., Birmingham, AL 35228.

35.    On January 24, 2000, Plaintiff, Dorothy Jones, executed a mortgage and note for her home located at 6904 Court N., Birmingham, AL 35228.  The lender was New South Federal. Plaintiff's loan was transferred to Bank of America on or about February 29, 2000.

36.    Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan was assigned number 4931281.

37.    After experiencing financial hardship, due in part to the state of the economy, Plaintiff contacted BOA on or about February 4, 2010 requesting a HAMP modification.

**False Statements of Fact Concerning HAMP Eligibility by Defendant**

38.     On or about April 18, 2011, BOA loan representative, Regina Mayes, advised Plaintiff by phone to refrain from making her regular mortgage payments.  Regina Mayes specifically told Plaintiff being "past due" and in "default" on her mortgage loan was a prerequisite for a HAMP modification eligibility.  This statement was false as default was not required for HAMP eligibility. BOA loan representative, Regina Mayes, omitted the fact that eligibility for HAMP was available to borrowers if default was reasonably foreseeable.

39.     BOA representative, Regina Mayes, knew the statement was false when made and intentionally omitted that only eminent default was required for HAMP eligibility. The statements and omission were made to induce the Plaintiff to rely on them.  The statements were specifically designed by BOA to set Plaintiff up for foreclosure.  Plaintiff believed she was required to be in default on her mortgage and was misled into believing that fact because the fact only eminent default was required was intentionally omitted.

40.     Relying on the false statement and omission, Plaintiff refrained from making her regular mortgage payment and fell into default status.  As a direct result, Plaintiff suffered damages when she subsequently made trial payments as instructed by BOA, which the bank refused to apply to her account, resulting in further default and foreclosure of her home.  Plaintiff lost her home, the equity in her home and money paid as trial payments as a direct result of the fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments.

**False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant**

41.     In March 2010, BOA provided Plaintiff a HAMP application and she properly completed the application and returned it to BOA with the requested supporting financial documents.

42.     However, as part of BOA's fraudulent scheme, on at least one occasion Plaintiff was falsely informed by BOA employees, and others that the documents were "not received," were "incomplete," or were "not current."   The same or similar statements were made on subsequent phone calls.  BOA employees knew these representations were false and this practice was policy and procedure at BOA.  *See* **Exhibits 2, 3, 4, 5 and 6.**

43.     These false statements were made by BOA employee, Regina Mayes, and others for the purpose of inducing Plaintiff to resend her modification application over and over in order frustrate the application process.

44.     These misrepresentations were made to Plaintiff by BOA representative, Regina Mayes and others, not for the purpose of processing Plaintiff's application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure.  BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.**

45.     Plaintiff believed these statements were true, relied on them, and as a result, unnecessarily resubmitted her application and supporting information via US Mail or Federal Express more than two (2) times.  As a direct result, Plaintiff was damaged and suffered a loss of the costs and time spent sending and resending her HAMP application on multiple occasions when BOA had no intention of reviewing it.

46.     By making these misrepresentations, BOA profited avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

47.     Plaintiff did not receive any written verification the application was ultimately received, but on or about March 20, 2011, Plaintiff received a letter stating she had been "approved" and requested she make "trial payments" of $496.15 pursuant to the Federal Government's Home Affordable Modification Program.  This statement was false as the application wasn't approved.  Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiff.

48.     This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing her HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged.

49.     It was and is BOA's practice to place "trial period payments….into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application.  (emphasis added). See, July 20, 2016 deposition of BOA Representative Lonnie S. Mills, *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722.  BOA employees fraudulently omitted this fact when requesting the Plaintiff make trial payments.

50.     Relying on BOA's misrepresentations and omissions, Plaintiff made seventeen (17) payments of $496.15 between 2011 and 2012, hoping to save her home.  Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on December 13, 2014, Plaintiff's home was foreclosed by Bank of America.  As a result of the foreclosure, a judgment in the amount of $24,000.00 was entered against Plaintiff. Plaintiff moved out of her home in 2014.

51.     Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit her account, the loss of her home and the equity in that home, as well as damage to her credit and the loss of some or all of the funds paid to BOA for trial payments.

52.     By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit.  BOA further profited by forcing Plaintiff into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A.

### Fraudulent Omission of the Application of Inspection Fees by BOA

53.     Despite the fact that Plaintiff lived in her home until 2014, BOA charged her account for a "Property Inspection" on twelve (12) occasions from 2004 to 2015, all while she was living in the home.  These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiff's account and added to the foreclosure judgment amount.

54.     BOA committed common law fraud upon the Plaintiff when throughout the HAMP application BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on her home and charging her account inspection fees.

55.     BOA committed common law fraud upon Plaintiff when the bank requested she make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

56.     The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing her trial payments would be applied to her mortgage and were for the purpose of final approval of her HAMP application.   BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

57.     As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments she believed were for final approval of her HAMP application.  BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

58.     Upon information and belief, BOA further profited by using Plaintiff's HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiff as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.).

59.     As Plaintiff has suffered a loss of her home and the equity in that home, as well as the loss of future equity in her home, her claim exceeds $75,000.00 and satisfies the amount in controversy required under 28 U.S.C. §1332.  See also *Alonzo v. Bank of America, N.A.* Case No. 8:17-cv-00238-T-23-MAP (Fla. M.D. 2017).

## COUNT I
### (Fraudulent Misrepresentation)

60.     The allegations in the preceding paragraphs of Plaintiff's Complaint are incorporated herein by reference as if fully set forth herein.

61.     BOA made false statements of fact to Plaintiff through the fraudulent scheme described in this Complaint.

62.     The statements made by BOA to Plaintiff that required default or delinquency on her mortgage in order to be eligible for HAMP was false.  Neither default nor delinquency was required under HAMP for eligibility, and BOA was aware of this fact.

63.     Plaintiff was falsely informed by BOA employees that her HAMP application documents were not received, were incomplete or were not current, causing Plaintiff to resubmit the information again and again.

64.     BOA made false statements of fact and intentional omissions when Plaintiff was informed she was "approved" and requested she make "trial payments."

65.     BOA employees made these statements with knowledge they were false.

66.     BOA made these statements for the purpose of inducing Plaintiff to rely on them.

67.     Plaintiff believed these statements were true, relied on them, and as a result, suffered damages when she refrained from making her regular mortgage payments.

68.     Plaintiff believed these statements were true, relied on them, and as a result, suffered damages when she unnecessarily sent her HAMP application and supporting information via U. S. Mail and Federal Express more over and over.

69.     Plaintiff believed these statements were true, relied on them, and as a result, suffered damages when she made trial payments that were either retained for profit or applied to fraudulent inspection fees by BOA.

70.     As a direct and proximate cause of the knowing misrepresentations by BOA described in the Complaint, Plaintiff suffered damages including but not limited to the costs for sending her HAMP applications and financial documents on multiple occasions when BOA had no intention of reviewing it, the loss of time spent sending and re-sending the HAMP application and financial documents, the loss of her home and the equity in that home, as well as damage to

her credit and the loss of some or all of the funds paid to BOA for trial payments for which BOA

retained for profit after foreclosure.

## COUNT II
### (Fraudulent Omission)

71.     The allegations in the preceding paragraphs of Plaintiff's Complaint are

incorporated herein by reference as if fully set forth herein.

72.     Due to the intentional omission, Plaintiff was unaware her payments were

being used to pay fraudulent inspection fees by BOA that were impermissible.

73.     For example, absent a specific finding of need by a local HUD office, the shortest

period between inspections authorized by the HUD servicing guidelines is 25 days:

> Generally, reimbursement will be limited to one inspection for each 30-day
> cycle.  This inspection should not be earlier than 25 days from the last
> inspection or later than 35 days after the last inspection.  A distinction must
> be made between those items which are required and those which are merely
> recommended.  Only where a local HUD Office has identified a need to
> inspect more frequently, and has made this a requirement, will a mortgagee
> be reimbursed for these additional inspections.  *HUD Servicing Guidelines,
> Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection
> Requirements, A. Inspections (c)(2)(a).*

74.     Further, multiple inspections are only allowed when the mortgaged property is

vacant:

> Where the mortgage is in default and the mortgagee has established that the
> mortgaged property is vacant, mortgagees shall inspect the mortgaged
> property every 25 to 35 days. *HUD Servicing Guidelines, Chapter 9, §
> 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A.
> Inspections (c).*

75.     However, even before a series of inspections may begin, under HUD servicing

guidelines, the mortgage must be in default, and the mortgagee is required to determine the

Plaintiff's home was vacant/abandoned by making a phone call and performing a visual inspection

to ensure the property had become vacant/abandoned:

> When the mortgage is in default and a payment is not received within 45 days of the due date and efforts to reach the mortgagor or occupant at least by telephone have been unsuccessful, the mortgagee must perform a visual inspection of the mortgaged property to determine if it has become vacant or abandoned. *HUD Servicing Guidelines, Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A. Inspections (a)(1).*

76.     BOA conducted inspection after inspection, all while Plaintiff was living in her home.  Although there is no private cause of action under the Guidelines for the Plaintiff, these fees are but one example of the overall fraudulent mortgage servicing scheme BOA has operated for years and for which Plaintiff has been victimized.

77.     Plaintiff was induced to rely on the fraudulent omissions by BOA.

78.     As a direct and proximate cause of the knowing omissions by BOA described in the Complaint, Plaintiff suffered damages in the loss of funds paid to BOA for trial payments for which BOA applied to fraudulent inspection fees.

**WHEREFORE**, Plaintiff prays:

1.     The Court enter a judgment for Plaintiff and against BOA for Fraudulent Misrepresentation and Fraudulent Omission in an amount to be determined by the Court at a trial in this matter;

2.     The Court tax costs of this action to BOA;

3.     For such other and further relief as the Court may deem just and proper; and

4.     The Court conduct a trial by jury on all issues.

Submitted this, the 1st day of December, 2017.

*/s/ Jay Aughtman*
Joseph "Jay" H. Aughtman (AUG001)
Attorney for Plaintiff

OF COUNSEL:
**Aughtman Law Firm, LLC**
1772 Platt Place
Montgomery, AL 36117
T: (334) 215-9873
F: (334) 213-5663
jay@aughtmanlaw.com


Jury Demand


Plaintiff Hereby Demands Trial By Jury Struck On All Issues Of This Cause.



DEFENDANT TO BE SERVED BY CERTIFIED MAIL AS FOLLOWS:


BANK OF AMERICA, N.A
CT CORPORATION SYSTEM
2 NORTH JACKSON STREET SUITE 605
MONTGOMERY, AL 36109

ELECTRONICALLY FILED
9/1/2017 1:48 PM
01-CV-2017-905050.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

COMMITMENT TO PURCHASE FINANCIAL INSTRUMENT
and
SERVICER PARTICIPATION AGREEMENT
for the
HOME AFFORDABLE MODIFICATION PROGRAM
under the
EMERGENCY ECONOMIC STABILIZATION ACT OF 2008

This Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") is entered into as of the Effective Date, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), and the undersigned party ("Servicer").  Capitalized terms used, but not defined contextually, shall have the meanings ascribed to them in Section 12 below.

Recitals

WHEREAS, the U.S. Department of the Treasury (the "Treasury") has established a Home Affordable Modification Program (the "Program") pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008 (the "Act"), as section 109 of the Act has been amended by section 7002 of the American Recovery and Reinvestment Act of 2009;

WHEREAS, the Program includes loan modification and other foreclosure prevention services;

WHERBAS, Fannie Mae has been designated by the Treasury as a financial agent of the United States in connection with the implementation of the Program;

WHEREAS, Fannie Mae will, in its capacity as a financial agent of the United States, fulfill the roles of administrator, record keeper and paying agent for the Program, and in conjunction therewith must standardize certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Program, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury;

WHEREAS, Federal Home Loan Mortgage Corporation ("Freddie Mac") has been designated by the Treasury as a financial agent of the United States and will, in its capacity as a financial agent of the United States, fulfill a compliance role in connection with the Program; all references to Freddie Mac in the Agreement shall be in its capacity as compliance agent of the Program;

WHEREAS, all Fannie Mae and Freddie Mac approved servicers are being directed through their respective servicing guides and bulletins to implement the Program with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac (the "GSE Loans"); accordingly, this Agreement does not apply to the GSE Loans;

WHEREAS, all other servicers, as well as Fannie Mae and Freddie Mac approved servicers, that wish to participate in the Program with respect to loans that are not GSE Loans (collectively, "Participating Servicers") must agree to certain terms and conditions relating to the respective roles and responsibilities of Program participants and other financial agents of the government; and

WHEREAS, Servicer wishes to participate in the Program as a Participating Servicer on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the representations, warranties, and mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Fannie Mae and Servicer agree as follows.

## Agreement

### 1. Services

A.    Subject to Section 10.C., Servicer shall perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines"); and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation"). The Program Documentation will be available to all Participating Servicers at www.financialstability.gov. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

B.    Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit B (the "Annual Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

C.    The recitals set forth above are hereby incorporated herein by this reference.

### 2. Authority and Agreement to Participate in Program

A.    Servicer shall perform the Services for all mortgage loans its services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor"). Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

B.    Notwithstanding subsection A., if (x) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (y) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (as defined below) otherwise payable with respect to such loan.

C.    Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans. Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Program as applied to GSE Loans.

D.    Servicer's performance of the Services and implementation of the Program shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

### 3. Set Up; Prerequisite to Payment

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Program as a Participating Servicer on or before the Effective Date of the Commitment; and (b) the data elements for each mortgage eligible for the Program

- 2 -

as and when described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to any modified mortgage for which the required data elements have not been provided.

4. Agreement to Purchase Financial Instrument; Payment of Purchase Price.

A. Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price (defined below). The conditions precedent to the payment of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

B. Solely in its capacity as the financial agent of the United States, and subject to subsection C. below, Fannie Mae shall: (i) remit compensation payments to Servicer; (ii) remit incentive payments to Servicer for the account of Servicer and for the credit of borrowers under their respective mortgage loan obligations; and (iii) remit payments to Servicer for the account of Investors, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit of borrowers or for the account of Investors under the Program Documentation shall be applied by Servicer to the borrowers' respective mortgage loan obligations, or remitted by Servicer to Investors, as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

C. The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, upon the satisfaction of the conditions precedent to payment described in subsections A. and B. above.

D. The value of the Agreement is limited to $798,900,000 (the "Program Participation Cap"). Accordingly, the aggregate Purchase Price payable to Servicer under the Agreement may not exceed the amount of the Program Participation Cap. For each loan modification that becomes effective, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that loan modification. In the event the Purchase Price actually paid with respect to that loan modification is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with borrowers intended to result in new loan modifications will be effected under the Agreement, and no payments will be made with respect to any new loan modifications from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap. Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

E. Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance (including homeowner's insurance and hazard and flood insurance) and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program, which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation and

- 3 -

other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae; or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, as financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit to the respective mortgage loan obligations of borrowers, and to the respective accounts of Investors, any portion of the Purchase Price to which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

F. At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection F. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

G. In the event that the Agreement expires or is terminated pursuant to Section 5 or Section 6, and subject to Fannie Mae's rights under Section 6, Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to subsection A. above to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae for inclusion in the Program in accordance with the Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

H. Notwithstanding anything to the contrary contained in subsection G. above, in the event that the Agreement is terminated pursuant to Section 6 B. in connection with an Event of Default by Servicer under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the account of the Servicer subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer (or, at Fannie Mae's discretion, an alternative provider) for the account of borrowers and Investors, as provided in the Agreement.

I. Notwithstanding anything to the contrary contained in subsection F. above, in the event that the Agreement is terminated pursuant to Section 6 C. in connection with an Event of Default by an Investor or a borrower under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the credit or account of the defaulting party subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer for the credit or account of non-defaulting parties as described in the Program Documentation.

J. Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4.B., or obtain repayment of prior payments made under Section 4.B., in connection with an Event of Default by Servicer or in connection with an evaluation of performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient; provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default or findings giving rise to this remedy. These remedies are not exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

K. Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer for the credit or account of an Investor or a borrower under Section 4.B., or obtain repayment of prior payments made for the credit or account of such parties under Section 4.B., in connection with an Event of Default by an Investor or a borrower. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection. These remedies are not

exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

5. Term

A. Qualifying mortgage loans may be submitted by Servicer and accepted by Fannie Mae as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to Program extensions by the Treasury or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof or suspension or termination of the Program by the Treasury; provided, however, no new qualifying mortgage loans may be submitted by Servicer or accepted by Fannie Mae from and after the date on which the Program Participation Cap is reached.

B. Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"), and during such additional period as may be necessary to: (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, mortgage modifications and the completion of all documentation relating thereto, during the Term. Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the end of the Term or earlier termination.

C. The Agreement may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

6. Defaults and Early Termination

A. The following constitute events of default under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):

(1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent to modification specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.

(2) Servicer: (a) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to a levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions.

(3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, or any Investor or borrower, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, fraud) in connection with the Program or the Agreement.

(4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Annual Certification is or becomes materially false, misleading, incorrect, or incomplete.

(5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or any failure by Servicer to comply with any

directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mae in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an Event of Default by Servicer under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default; and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the credit or account of borrowers and Investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4.B; and/or (ii) require repayment of prior payments made to Servicer under Section 4.B, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B, only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under the Agreement.

C. Fannie Mae may take any, all, or none of the following actions upon an Event of Default involving an Investor or a borrower in connection with the Program:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer for the credit, or account of, the defaulting party under Section 4.B; and/or (ii) require repayment of prior payments made to the defaulting party under Section 4.B. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mae in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement that relate to the defaulting Investor or borrower.

D. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement immediately upon written notice to Servicer:

- 6 -

(1) at the direction of the Treasury;

(2) in the event of a merger, acquisition, or other change of control of Servicer;

(3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

(4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

E. The Agreement will terminate automatically:

(1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

(2) upon the expiration or termination of the Program.

F. The remedies available to Fannie Mae upon an Event of Default under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

G. If the event of termination of the Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

H. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period. If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1., Section 6.A.4, or Section 6.A. 5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.B.4., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.

## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement. If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement. If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter. This will be done in an expeditious manner. Servicer shall continue diligent performance of the Services pending resolution of any dispute. Fannie Mae and Servicer reserve the right to pursue other legal or equitable rights they may have concerning any dispute. However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.

## 8. Transfer or Assignment

A. Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans subject to this Agreement; and (ii) any other transfers or assignments of Servicer's rights and obligations under this Agreement. Such notice must include payment instructions for payments to be made to the transferee or assignee of the mortgage loans subject to the notice (if applicable), and evidence of the assumption by such transferee or assignee of the mortgage loans or other rights and obligations that are transferred, in the form of Exhibit C (the "Assignment and

- 7 -

Assumption Agreement"). Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4.B, with respect to mortgage loans that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac. Any purported transfer or assignment of mortgage loans or other rights or obligations under the Agreement in violation of this Section is void.

B. Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances which may impair Servicer's ability to perform its obligations under the Agreement.

9. Notices

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact at such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial over-night courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12.B, below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.

To Servicer:

Bank of America
2900 Madera Road
Mail Code: CA6-920-01-07
Simi Valley, CA 93065
email:
Facsimile:

With copy to:

Bank of America
Bank of America Plaza
101 S. Tryon Street
Mail Code: NC1-002-29-01
Charlotte, NC 28255-0001
email:
Facsimile:

To Fannie Mae:

Fannie Mae
3900 Wisconsin Avenue, NW
Washington, DC 20016
Attention: General Counsel
Facsimile:
email:

To Treasury:

Chief
Office of Homeownership Preservation
Office of Financial Stability
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220
Facsimile: (202) 622-9219

To Freddie Mac:

Freddie Mac
8100 Jones Branch Drive
McLean, VA 22102
Attention: Vice President, Making Home Affordable -- Compliance
Facsimile: (703) 903-2544
Email to: MHA_Compliance@freddiemac.com

10. Modifications.

A. Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B. Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Program, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Program.

C. Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impacts the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors or borrowers under the Program, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with the Program (each, a "Program Modification" and, collectively, the "Program Modifications") shall be effective only on a prospective basis. Participating Servicers will be afforded the opportunity to opt-out of the Program when Program Modifications are published with respect to some or all of the mortgage loans sought to be modified under the Program on or after the effective date of the Program Modification, at Servicer's discretion. Opt-out procedures, including, but not limited to, the time and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification. For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification

-9-

and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program modification prompting the opt-out) with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae prior to the opt-out.

11. Miscellaneous

A. The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles. Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia. Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B. The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C. Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

D. Failure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time. No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof. The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E. The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F. The Commitment and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G. The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof. In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail. In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H. Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5 B., 6 F., 6 G., 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Program, shall survive the expiration or termination of the Agreement.

12. Defined Terms; Incorporation by Reference

A. All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto. Specific references

throughout the Agreement to individual documents that are incorporated by reference into the Commitment are not inclusive of any other documents that are incorporated by reference, unless so noted contextually.

B. The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment and Financial Instrument to Treasury and Servicer with a completed cover sheet, in the form attached hereto as Exhibit D (the "Cover Sheet"). The Commitment and Financial Instrument and accompanying Cover Sheet will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 9.

C. The Program Documentation and Exhibit A – Form of Financial Instrument, Exhibit B – Form of Annual Certification, Exhibit C – Form of Assignment and Assumption Agreement and Exhibit D – Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

[SIGNATURE PAGE FOLLOWS; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

In Witness Whereof, Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

SERVICER: Bank of America, N.A.

By:
Name: Steve B. [illegible]
Title: Senior Vice President
Date: April 17, 2009

FANNIE MAE, solely as Financial Agent of the United States:

By:
Name: Leslie Peeler
Title: Vice President
Date: 4/17/09

**EXHIBITS**

Exhibit A      Form of Financial Instrument

Exhibit B      Form of Annual Certification

Exhibit C      Form of Assignment and Assumption Agreement

Exhibit D      Form of Cover Sheet

## EXHIBIT A

### FORM OF FINANCIAL INSTRUMENT

## FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1.  Purchase Price Consideration; Services. This Financial Instrument is being purchased by Fannie Mae pursuant to Section 4 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price." The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of this Financial Instrument and the Commitment by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

2.  Authority and Agreement to Participate in Program. Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third-party consents and waivers that are required, by contract or law, in order to effectuate any loan modification under the Program.

3.  Audits, Reporting and Data Retention.

    (a)  Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal onsite visits and to conduct formal onsite and offsite physical, personnel and information technology testing, security reviews, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with the Program on thirty (30) days' prior written notice.

    (b)  Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification, under the Program and any trials conducted in connection with the Program, as required by the Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac as, when and in the manner specified in the Program Documentation. In addition, Servicer shall provide copies of executed contracts and tapes of loan pools related to the Program for review upon request.

    (c)  Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

- 1 -

(d) In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Services in connection with the Program. In addition, Servicer shall maintain a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations in which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4. **Internal Control Program.**

(a) Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

(b) Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5. **Representations, Warranties and Covenants.** Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

(a) Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

(b) Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound,

- 2 -

provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(c) Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all mortgage modifications and all trial period modifications will be offered to borrowers, fully documented and serviced in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

(d) Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Program in accordance with the Agreement.

(e) Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

(h) Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default.

(i)  Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(j)  Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Program.

(k)  Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(l)  Servicer shall sign and deliver an Annual Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, in the form attached as Exhibit B to the Agreement.

6.   Use of Contractors. Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7.   Data Rights.

(a)  For purposes of this Section, the following definitions apply:

(i)  "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Program.

(ii)  "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Program and to permit others to do so in connection therewith.

(iii)   "NPI" means nonpublic personal information, as defined under the GLB.

(iv)   "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b)   Subject to Section 7(c) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a contractor of Servicer in connection with the Program, provided, however, that NPI will not be transferred by Fannie Mae in violation of the GLB and; provided, further, that Servicer acknowledges and agrees that any use of NPI by, the distribution of NPI to, or the transfer of NPI among, Federal, state and local government organizations and agencies does not constitute a violation of the GLB for purposes of the Agreement. If requested, such Data shall be made available to the Treasury, Fannie Mae, or Freddie Mac upon request, or as and when directed by the Program Documentation, in industry standard useable format.

(c)   Servicer expressly consents to the publication of its name as a participant in the Program, and the use and publication of Servicer's Data, subject to applicable state and federal laws regarding confidentiality, in any form and on any media utilized by Treasury, Fannie Mae or Freddie Mac, including but not limited to, on any website or webpage hosted by Treasury, Fannie Mae, or Freddie Mac, in connection with the Program, provided that no Data placed in the public domain will: (i) contain the name, social security number, or street address of any borrower or other information that would allow the borrower to be identified; or, (ii) if presented in a form that links the Servicer with the Data, include information other than program performance and participation related statistics such as the number of modifications, performance of modifications, characteristics of the modified loans, or program compensation or fees, with any information about any borrower limited to creditworthiness characteristics such as debt, income, and credit score. In any Data provided to an enforcement or supervisory agency with jurisdiction over the Servicer, these limitations on borrower information do not apply.

8.   **Publicity and Disclosure.**

(a)   Servicer shall not make use of any Treasury name, symbol, emblem, program name, or product name, in any advertising, signage, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b)   Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c)   Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9.   **Limitation of Liability.** IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO THE PROGRAM OR THE AGREEMENT, OR FOR ANY

ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10.   Indemnification.  Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from: (a) Servicer's breach of Section 5 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not settle any suit or claim regarding any of the foregoing without Fannie Mae's prior written consent if such settlement would be adverse to Fannie Mae's interest, or the interests of the Treasury or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

IN WITNESS WHEREOF, Servicer hereby executes this Financial Instrument on the date set forth below.

Bank of America, N.A.

Steve C. Bailey
Senior Vice President, Mortgage Servicing Executive

APRIL 17, 2009
Date

6

**EXHIBIT B**

**FORM OF ANNUAL CERTIFICATION**

## ANNUAL CERTIFICATION

This Annual Certification is delivered as provided in Section 1.B. of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby certifies, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.       Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer had full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.       Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement has not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any contractual limitations under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.       (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such performance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

4.       Servicer has: (i) performed the Services required under the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Program in accordance with the Agreement.

5.       Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

6.       Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

7.      Servicer has disclosed to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

8.      Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mac, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors. In connection with Privacy Act inquiries, Servicer has provided updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9.      Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer has provided such additional customer service call support as Fannie Mae has reasonably requested to support the Program.

10.     Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac have required. Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

In the event that any of the certifications made herein are discovered not to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

[INSERT FULL LEGAL NAME OF SERVICER]:

_____
[Name of Authorized Official]               Date
[Title of Authorized Official]

- 3 -

EXHIBIT C

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee: (i) all of its rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on the schedule attached hereto as Schedule 1 ("Schedule 1") and/or (ii) certain other rights and obligations under the Underlying Agreement that are identified on Schedule 1; and

WHEREAS, Assignee has agreed to assume the mortgage loans and other rights and obligations under the Underlying Agreement identified on Schedule 1.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

2. Assumption. Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

3. Effective Date. The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4. Successors. All future transfers and assignments of the mortgage loans, rights and obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. Counterparts. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above:

ASSIGNOR: [INSERT FULL LEGAL NAME OF ASSIGNOR]

ASSIGNEE: [INSERT FULL LEGAL NAME OF ASSIGNEE]

By: _____
Name: _____
Title: _____
Date: _____

By: _____
Name: _____
Title: _____
Date: _____

- 2 -

## SCHEDULE 1

### To

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**EXHIBIT D**

**FORM OF COVER SHEET**

Cover Sheet for Transmission of

Commitment to Purchase Financial Instrument and Servicer Participation Agreement

**To:** [INSERT FULL LEGAL NAME OF SERVICER] ("Servicer"), [INSERT SERVICER CONTACT]

**From:** Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae")

**Copy To:** The U.S. Department of the Treasury, [INSERT TREASURY CONTACT]

**Date:** [INSERT DATE OF TRANSMISSION]

**Method of Transmission:** [Facsimile to [INSERT FAX NUMBER OF SERVICER]] [[Email with PDF file attached to [INSERT SERVICER EMAIL ADDRESS][Specify other method of electronic delivery]]

### NOTICE

This transmission constitutes notice to Servicer that the Commitment to Purchase Financial Instrument and Servicer Participation Agreement, by and between Fannie Mae and Servicer (the "Commitment") and the Financial Instrument attached thereto have been fully executed and are effective as of the date of this transmission. The date of this transmission shall be the "Effective Date" of the Commitment and the Financial Instrument.

Copies of the fully executed Commitment and Financial Instrument are attached to this transmission for your records.

- 1 -