## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DOROTHY JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-0012-JEO |
| | ) | |
| BANK OF AMERICA, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

On December 1, 2017, Plaintiff Dorothy Jones filed this action in the Circuit

Court of Jefferson County, Alabama, Birmingham Division, asserting fraud claims

under Alabama law against Defendant Bank of America, N.A. ("BOA").  (Doc.[1] 1-

1 at 3-21 ("Complaint" or "Compl.")).  BOA removed the action pursuant to 28

U.S.C. §§ 1441 and 1446, invoking this court's diversity jurisdiction.[2]  (Doc. 1).

The cause now comes to be heard on BOA's motion to dismiss for failure to state a

---

[1] References to "Doc(s) ___" are to the document number of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the clerk of the court.  Pinpoint citations to the complaint are to the applicable paragraph(s) and count(s), where applicable.  Other pinpoint citations are to the page of the electronically filed document in the court's CM/ECF filing system, which may not correspond to the pagination on the original "hard copy" of the document presented for filing.

[2] Under the diversity statute, federal district courts have original jurisdiction over civil actions between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a)(1).  The allegations of the Complaint support that Plaintiff is a citizen of Alabama (Compl. ¶ 1), and that BOA is a citizen of both Delaware and North Carolina.  (*Id.* ¶ 2); *see also* 28 U.S.C. § 1332(c)(1).  Although Plaintiff originally filed this action in state court, her Complaint expressly alleges that her claim exceeds $75,000.  (*Id.* ¶ 59).  Accordingly, diversity jurisdiction is present.

claim under Fed. R. Civ. P. 12(b)(6). (Doc. 4). Because that motion and Plaintiff's response in opposition (Doc. 9) included documentary evidence beyond the original complaint, the court entered an order giving notice that it intended to treat BOA's pending motion as one for a Fed. R. Civ. P. 12(b)(6) dismissal or, in the alternative, for summary judgement under Fed. R. Civ. P. Rule 56. (Doc. 15). Both Plaintiff and Defendant have responded. (Doc. 16, 18). For the reasons explained below, the court[3] concludes that BOA's dispositive motion is due to be granted and that this action is due to be dismissed with prejudice.

## I. REVIEW STANDARDS

Although this action was originally filed in state court, since it has been removed, procedural matters are now governed by the Federal Rules of Civil Procedure, including as they relate to pleading standards and dismissal for failing to meet them. *See* Rule 81(c)(1), Fed. R. Civ. P.; *Willy v. Costal Corp.*, 503 U.S. 131, 134 (1992); *Duncan v. Citimortgage, Inc.*, 617 F. App'x 958, 960 (11th Cir. 2015). In particular, Rule 12(b)(6), Fed. R. Civ. P., authorizes a motion to dismiss a plaintiff's complaint in whole or in part on the ground that its allegations fail to state a claim upon which relief can be granted. That provision, in turn, is read in light of Rule 8(a)(2), Fed. R. Civ. P., which requires only "a short and plain

---

[3] This action was originally assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and the court's general order of reference dated January 2, 2015. The parties have since consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed. R. Civ. P. (Doc. 10).

statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court is required to accept the well-pled factual allegations of the complaint as true and give the plaintiff the benefit of all reasonable factual inferences. *See Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Nor is it proper to assume that the plaintiff can prove facts he or she has not alleged or that the defendants have violated the law in ways that have not been alleged. *Twombly*, 550 U.S. at 563 n.8 (*citing Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 526 (1983)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*, 550 U.S. at 555

(citations, brackets, and internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level ...." *Id.* Thus, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *i.e.*, its "factual content ... allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citations omitted).

Further, because Plaintiff's Complaint seeks to recover for fraud, it implicates Rule 9(b), Fed. R. Civ. P., which imposes heightened pleading standards by requiring a party to "state with particularity the circumstances constituting fraud." Generally, this occurs where the pleading alleges

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and
>
> (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and
>
> (3) the content of such statements and the manner in which they misled the plaintiff, and
>
> (4) what the defendants obtained as a consequence of the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotations omitted). However, allegations relating to "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

4

In analyzing a motion to dismiss under Rule 12(b)(6), the court is generally limited to examining the allegations of the complaint itself, but it may also look to documents attached or referred to the complaint that are central to the plaintiff's claims and whose authenticity is unchallenged. *See SFM Holdings, Ltd. v. Banc of Amer. Securities, LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). To the extent that such documents are considered and they contradict the allegations of the complaint, the documents control. *Friedman v. Market Street Mortg. Corp.*, 520 F.3d 1289, 1295 n. 6 (11th Cir. 2008); *Griffin Indust., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007). If a district court considers materials beyond the above scope, however, it is required to treat the motion as one for summary judgment under Fed. R. Civ. P. 56. *See* Fed. R. Civ. P. Rule 12(d); *SFM Holdings*, 600 F.3d at 1337; *Harper v. Lawrence County, Ala.*, 592 F.3d 1227, 1232 (11th Cir. 2010).

Pursuant to Rule 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. Proc. 56(c)(1)(A), (B). In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    BACKGROUND

Plaintiff's cause of action relates to BOA's participation in the Home Affordable Modification Program ("HAMP"), which was created by the United States Department of the Treasury pursuant to authority granted by the Emergency

Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201-5261. *See Miller v. Chase Home Finance, LLC*, 677 F.3d 1113, 1116 (11th Cir. 2012). HAMP is a federal program "designed to prevent avoidable home foreclosures by incentivizing loan servicers to reduce the required monthly mortgage payments for certain struggling homeowners." *Id.* Plaintiff alleges that, in April 2009, BOA, the nation's largest mortgage servicer, entered into a Servicer Participation Agreement with the federal government to participate in HAMP (*see* Doc. 1-1 at 22-50) in exchange for a commitment by the government to infuse BOA with hundreds of millions of dollars. (Compl. ¶¶ 11, 12). Plaintiff says that, despite the federal funds it would receive under the Servicer Participation Agreement, BOA knew that conforming to its obligations, "in providing screening for HAMP applications and accepting homeowners who meet the requirements," would cost BOA millions of dollars. (Compl. ¶ 16). As such, Plaintiff claims, BOA

> made a calculated decision … to permit just enough HAMP modifications to create a defense … against Federal Government agencies … [and to convince] Congressional skeptics and the public that BOA was making best efforts to comply with [the] Agreement. Simultaneously, however, BOA chose to develop methodical business practices designed to intentionally prevent scores of [qualified] homeowners from become eligible or staying eligible for a permanent HAMP modification.

(*Id.* ¶ 17). To that end, Plaintiff says, BOA "developed systems and procedures that deliberately obfuscated, misled, and otherwise deceived … homeowners and regulators, resulting in ineligibility through no fault of the homeowner." (*Id.* ¶ 18).

7

In this vein, Plaintiff has attached to her Complaint unsworn declarations, *see* 28 U.S.C. § 1746, of five former BOA employees who have outlined their alleged experiences with BOA's purported scheme to defraud applicants for HAMP loan modifications.  (*See* Doc. 1-2 at 1-23).  Those declarations are dated between May 2013 and February 2017, and four of them contain court file stamps indicating they were filed as evidence in June 2013 in a multi-district litigation action then pending in the United States District Court for the District of Massachusetts styled, *In re Bank of America Home Affordable Modification (HAMP) Contract Litigation*.  *See* No. 1:10-md-2193-RWZ, Doc. 210-4 (D. Mass. June 7, 2013).  Plaintiff has also included a copy of a memorandum opinion dated September 4, 2013, in which that district court recognized that those plaintiffs had plausibly alleged that BOA "utterly failed to administer its HAMP modifications in a timely and efficient way; that in many cases it lost documents, or pretended it had not received them, or arbitrarily denied permanent modifications," though the court denied the plaintiff's motion for class certification.  (Doc. 1-2 at 32-42, 2013 WL 4759649).  Finally, Plaintiff also attached a report to Congress from the Office of the Inspector General for the Troubled Asset Relief Program dated January 27, 2017, that was critical of BOA's administration of its HAMP loan medication program.  (Doc. 1-2 at 25-31).

Plaintiff's claims in this action arise from how BOA purportedly carried out its alleged fraudulent scheme in dealing with her as she attempted to obtain a HAMP modification on her home mortgage loan. Her salient allegations are as follows: In January 2000, Plaintiff executed a mortgage on her home in Birmingham, along with a promissory note to obtain a loan from New South Federal Savings Bank. (*Id*. ¶ 35; *see also* Doc. 4 at 4-13, Exhibit A to BOA's Motion to Dismiss). The following month, her mortgage loan was assigned to BOA, which serviced it thereafter. (Compl. ¶ 35). On or about February 4, 2010, Plaintiff contacted BOA to request a modification of her loan pursuant to HAMP. (*Id*. ¶ 37). In March 2010, BOA provided her with an application, which she completed and returned to BOA with requested financial documentation. (*Id*. ¶ 41). Plaintiff claims, however, that, on several subsequent phone calls, she was informed by BOA loan representative Regina Mayes "and others" that the application documents Plaintiff had sent were "not received," were "incomplete," or were "not current." (*Id*. ¶¶ 42, 43). Those statements, Plaintiff says, were false, made pursuant to a BOA practice designed to "induc[e] Plaintiff to resend her modification application over and over" (Compl. ¶¶ 42, 43), and "frustrat[e] the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure." (*Id*. ¶ 44). Plaintiff asserts that she relied on these false statements by "unnecessarily resubmitt[ing] her application and supporting

9

information via US Mail or Federal Express more than two (2) times" (*id.* ¶ 45), thereby causing her to lose "costs" and "time" spent preparing and mailing the additional applications. (*Id.* ¶ 70).

While Plaintiff alleges that "BOA had no intention of reviewing" her application (*Id.* ¶¶ 45, 70), she also acknowledges that, in or about March 2011, she received a letter from BOA advising that she had been approved for a trial period HAMP modification and requesting that she make "trial payments" of $496.15 per month. (Compl. ¶ 47). In her Complaint, Plaintiff explains that once a homeowner's application for a HAMP modification is approved, the homeowner typically begins a three-month trial payment period. (*Id.* ¶ 13). If timely payments are made during that period, the homeowner must be offered a permanent modification, whereby the terms in effect during the trial payment period are extended for five years. (*Id.*) After the homeowner completes five years under the terms of the modification, the lender may increase the interest rate on the loan by 1% annually up to the prevailing Freddie Mac interest rate in effect at the time the modification was made. (*Id.* ¶ 14).

On this score, BOA has attached to its motion to dismiss a copy of what it claims, and that Plaintiff does not dispute, is that approval letter, dated February 18, 2011. (Doc. 4 at 15). In the letter, BOA states that it had determined Plaintiff's mortgage loan was HAMP-eligible, and BOA enclosed "Trial Period

Plan" documents and coupons to make three monthly payments of $496.15, due on the first of the month in March, April, and May 2011. (*Id.* at 16-22). The letter further advised Plaintiff that she had to sign and return the enclosed "Trial Period Pack" by March 20, 2011, which Plaintiff did, executing and dating the paperwork on February 21, 2011. (*Id.* at 15, 22). Finally, the letter stated that, after Plaintiff had completed the Trial Period Plan by timely making the three payments, BOA would send her "additional documents" that she would need to sign and return "before [her] loan will be permanently modified." (*Id.* at 15).

The HAMP Trial Period Pack enclosed with the approval letter made further statements and disclosures. Included in these was a statement that Plaintiff's eligibility for a HAMP modification required her to certify, among other things, that "[she is] unable to afford [her] mortgage payments for the reasons indicated in her [HAMP modification application] and as a result, (i) [she is] either in default or, (ii) [she does] not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments." (*Id.* at 19). The documents also advised Plaintiff expressly that "[i]f [she has] not made the Trial Period Payments required under … [the Trial Period] Plan, … [her existing mortgage agreement] Loan Documents will not be modified and [the] Plan will terminate" and, in which case, if Plaintiff was "not eligible for any other loss mitigation option," BOA might pursue foreclosure. (Doc. 4 at 20, ¶¶ 2(B), (E)). The documents further explained

11

that "payments received by [BOA] under [the] Plan shall be held by [BOA] in a suspense account until [Plaintiff] successfully makes" the payments required under the Plan, whereupon the payments previously sent would "be applied, at [BOA]'s option, first to the oldest payments due, or to any advances or fees due, unless applicable law requires a different application method." (*Id.*, ¶ 2(C)). However, they stated, if the "Plan is canceled and/or terminated for any reason, any funds in this suspense account shall be credited to [her] loan pursuant to the terms of [her] Loan Documents and shall not be refunded to [her]." (*Id.*) Finally, the documents recognized that the Trial Period Plan itself "[was] not a modification of [her existing mortgage agreement] Loan Documents and that the Loan Documents will not be modified unless and until [she] meet[s] all of the conditions required for modification" and that BOA "will not be obligated or bound to make any modification of the Loan Documents if [she] fail[s] to meet any one of the requirements under [the] Plan." (*Id.* at 20-21, ¶¶ 2(F), (G)).

In spite of the Trial Period Plan approval correspondence, Plaintiff insists that her HAMP modification "application wasn't [actually] approved" and that BOA "had no intention of approving [her] application." (Compl. ¶ 47). Instead, Plaintiff claims that the letter's statement that her application had been "approved" was false, made as part of a broader pattern and practice on BOA's part to induce borrowers like her to make "trial payments" that BOA would keep in "an

unapplied account until [BOA] made a decision on the borrower['s] HAMP application." (*Id.* ¶ 48 (emphasis omitted)). According to Plaintiff, instead of "applying" those funds, presumably to the loan balance, BOA would retain them "for profit after foreclosure or apply [them] to fraudulent inspection and other fees the bank charged." (*Id.*) On the latter point, Plaintiff explains that BOA regularly charged borrowers for "property inspection" fees that are "impermissible under the HUD [United States Department of Housing and Urban Development] Servicing Guidelines." (*Id.* ¶ 53; *see also id.* ¶¶ 48, 73-75).

Plaintiff suggests she was personally victimized by such tactics. In particular, she says that, she "rel[ied]" on the February 2011 letter approving her for a trial period plan by making 17 payments of $496.15 each "between 2011 and 2012, hoping to save her home." (*Id.* ¶ 50). Likewise, Plaintiff contends that, between 2004 and 2015, BOA conducted twelve "unnecessary and improper inspections on her home and charging her account inspection fees" on each occasion, with some of the funds from her trial payments in 2011 and 2012 being applied to pay such fees. (Compl. ¶¶ 53-55).

Plaintiff also claims that, shortly after she received the letter stating she was approved for a trial period plan, she was misled by BOA loan representative Mayes about the eligibility requirements for a HAMP modification. Specifically, Plaintiff maintains that, on or about April 18, 2011, Mayes "advised Plaintiff by phone to

13

refrain from making her regular mortgage payments." (*Id.* ¶ 38). Plaintiff says Mayes further told her to do so because being "past due" and in "default" on her loan, according to Mayes, "was a prerequisite for … HAMP modification eligibility." (*Id.*) Plaintiff claims that such statement was false because neither an actual default nor delinquency is, in fact, required to be eligible under HAMP; rather, Plaintiff says, a homeowner can be eligible so long as a "default" is merely "eminent [sic]" (*id.* ¶ 39) or is otherwise "reasonably foreseeable." (*Id.* ¶ 38).

Although Plaintiff alleges that, "between 2011 and 2012," she made 17 mortgage payments of $496.15 each, purportedly in "rel[iance]" on the February 2011 trial period plan letter (Compl. ¶ 50), Plaintiff simultaneously claims that she "rel[ied]" on Mayes's statement on the April 2011 phone call by "refrain[ing] from making her regular mortgage payment," thereby causing her loan to fall into "default status." (*Id.* ¶ 40). Plaintiff does not specifically allege when she so refrained or when any default was declared or otherwise occurred. Plaintiff does plead, however, that BOA ultimately foreclosed on her home on December 14, 2014, and that, as a result, a judgment in the amount of $24,000.00 was later entered against her. (*Id.* ¶ 50).

As previously noted, Plaintiff's Complaint makes repeated allegations to the effect that BOA developed "methodical business practices designed to intentionally prevent scores of eligible homeowners from becoming eligible or

14

staying eligible for a permanent HAMP modification." (Compl. ¶ 17; *see also, e.g., id.* ¶ 27(a) ("BOA was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications …" (internal quotation marks and citation omitted)); *id.* ¶ 27(b) ("Bank of America's deliberate practice was to string homeowners along with no intention of providing permanent modifications."); *id.* ¶ 29 ("BOA's fraudulent scheme worked as intended. A January 27, 2017 Inspector General Report to Congress found BOA "[w]rongfully denying homeowners admission into HAMP" and "denied 79% of all who applied for HAMP" ….). And while Plaintiff does not expressly and unambiguously claim that BOA adhered to that pattern in her particular case by, in fact, actually denying or *never* granting her a permanent HAMP loan modification, at the very least, as Defendants say, "that appears to be the insinuation." (Doc. 5 at 5; *see also* Compl. ¶ 45 ("BOA had no intention of reviewing" her HAMP application); *id.* ¶ 47 (stating that the statement in the February 2011 trial period plan letter that she had been "approved" was "false as the application wasn't approved. Instead, BOA had no intention of approving the application …); *id.* ¶ 55 ("BOA committed common law fraud upon Plaintiff when the bank … omitted the fact that it had no intention of approving the application …."). Indeed, in her brief, Plaintiff comes right out and says it: "Eventually BOA denie[d] her loan modification …." (Doc. 9 at 2).

BOA, however, has attached to its motion to dismiss a copy of what purports to be just such a permanent "Loan Modification Agreement." (Doc. 4 at 23-32, Exhibit C to BOA's Motion to Dismiss). Plaintiff signed and dated that document on October 23, 2012 (*id.* at 30), and BOA recorded it in the probate court public records on December 9, 2013. (*Id.* at 32). Under the terms of the instrument, Plaintiff's loan was deemed modified as of June 1, 2011, *i.e.*, the first month after the third and final payment under her trial period plan referenced in the February 2011 approval letter, which served as the commencement of a new 30-year maturity period. (*Id.* at 27). The document further provides that Plaintiff was due to make monthly payments of $511.39 (comprised of $273.79 in principal and interest, plus $237.60 in escrow payments) on the first of each month, beginning on November 1, 2012. (*Id.*)

Plaintiff's response in opposition to BOA's motion to dismiss does not challenge the authenticity of the "Loan Modification Agreement" document. Rather, she seeks only to impugn its legal import, characterizing it as merely a "supposed permanent modification." (Doc. 9 at 2). Plaintiff has also sought to counter it by attaching two letters she subsequently received from BOA but which are not referenced in her Complaint.[4] (*See* Doc. 9-1). The first is dated January

---

[4] For reasons that escape the court, Plaintiff's opposition to the motion to dismiss also attached duplicate copies of the same five declarations from former BOA employees that Plaintiff attached to her complaint. (Doc. 9-2).

10, 2014.  (*Id.* at 4-5).  It starts by thanking Plaintiff "for contacting [BOA] to discuss available foreclosure prevention alternatives."  (*Id.* at 4).  The letter then goes on to state, however, "[W]e regret to inform you that based on careful review of the information provided, you do not meet the eligibility requirements to qualify for a loan assistance program, such as a modification, or a short sale."  (*Id.*)  The second letter is dated July 10, 2014.  (*Id.* at 1-3).  It similarly thanks Plaintiff for contacting BOA "to discuss loan assistance options," but it too states that BOA has deemed her "not eligible for any loan mortgage assistance program, including loan modification [or] short sale …."  (Doc. 9-1 at 1).  That letter than goes on to explain further why BOA deemed Plaintiff not to meet the eligibility requirements for certain "loan modification programs," including three types of modification under HAMP specifically.  (*Id.* at 1-2).

Plaintiff's Complaint pleads a cause of action for fraud under Alabama state law, divided into two counts.  Count I raises claims for "Fraudulent Misrepresentation" based on three ostensibly false statements allegedly made by BOA or its employees.  First, Plaintiff asserts a misrepresentation claim based on statements by Mayes "and others" advising Plaintiff that her application documents for a HAMP modification were "not received," "incomplete," or "not current." (See Compl. ¶¶ 42, 63).  Second, Plaintiff cites BOA's statement in the trial period plan letter to the effect that she had been "approved" for a loan modification.  (*Id.*

¶¶ 64).  And third and finally, Plaintiff points to statements on the April 2011 phone call whereupon Mayes allegedly advised Plaintiff to refrain from making mortgage payments because eligibility for a HAMP modification required the Plaintiff to be "past due" and in "default" on her loan.  (*Id.* ¶¶ 44).

Count II, in turn, is captioned, "Fraudulent Omission."  With respect to that theory, Plaintiff alleges that BOA committed "fraud upon the Plaintiff" when throughout the HAMP application process, BOA communications "omitted the fact that the bank was conducting unnecessary and improper inspections on her home and charging her account inspection fees" that were, she claims, "impermissible" under HUD servicing guidelines.  (Compl. ¶¶ 53, 54; *see also id.* ¶¶ 71-76).  Plaintiff similarly claims that BOA committed "fraud … when the bank requested she make trial payments during the [pendency of her] HAMP application and omitted the fact that [BOA] had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspections fees."  (*Id.* ¶ 55; *see also id.* ¶¶ 47, 64, 71-78).  The court notes, however, that Plaintiff has elsewhere in the Complaint leveled allegations that BOA committed "fraud" through three other "omissions" related to claims already described.  First, she claims that BOA "fraudulently omitted" that it "had no intention of approving [her] application" for a HAMP modification.  (*Id.* ¶¶ 47, 55; *see also id.* ¶ 45 ("BOA had no intention of reviewing [her HAMP

application]")).  Second, Plaintiff contends that when BOA requested that she make trial payments, it "fraudulently omitted [the] fact" that "[i]t was and is BOA's practice to place trial period payments into an unapplied account until BOA made a decision on the borrowers' HAMP application" (*id.* ¶ 49 (internal quotation marks, emphasis, and ellipses all omitted)).  Third, in reference to her April 2011 phone call with Mayes, Plaintiff alleges that she "omitted the fact that eligibility for HAMP was available to borrowers if default was reasonably foreseeable" (*id.* ¶ 38), *i.e.*, "that only eminent [sic] default was required."  (Compl. ¶ 39).

BOA has filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) (Doc. 4), along with a brief.  (Doc. 5).  BOA raises the following theories in support of dismissal:

(1) that there is no private cause of action under HAMP;

(2) that Plaintiff's claims are barred by Alabama's statute of frauds because the alleged misrepresentations concerning Plaintiff's credit agreement were never reduced to writing;

(3) that Plaintiff's claims are not viable as ones for fraud because they are not independent from a breach of contract, but, rather, relate directly to the performance of the terms of Plaintiff's note, mortgage, and loan modification;

(4) that Plaintiff's claims are barred by Alabama's two-year statute of limitations on fraud claims;

(5) that the allegations of the Complaint are deficient under Fed. R. Civ. P. 8(a) and 9(b), as interpreted in *Twombly* and *Iqbal*; and

(6) that some or all of Plaintiff's claims are groundless because she was, in fact, granted a permanent modification of her loan pursuant to HAMP.

(Doc. 5 at 2). Plaintiff has opposed the motion. (Doc. 9). Because both parties filed documents that are neither referenced in the Complaint nor necessarily central to the Plaintiff's claims, the court advised that it intended to consider those additional documents and treat BOA's motion as one to dismiss or, alternatively, one for summary judgment. (Doc. 15). The court also afforded Plaintiff an opportunity to submit additional evidence or argument as she might see fit. (*Id.*) Plaintiff responded that she is content to rely on the evidentiary materials already before the court (Doc. 16), although she later filed copies of four judicial orders and opinions from federal and state trial courts in Florida as persuasive authority for her legal arguments. (Docs. 17, 19). BOA has filed a reply brief in support of its motion as well. (Doc. 18).

## III.   DISCUSSION

BOA argues that it is entitled to a dismissal of all of Plaintiff's claims. BOA contends that is so on the basis that the allegations of Plaintiff's Complaint fail to state affirmatively any claim upon which relief can be granted, particularly in light of Rule 9(b)'s heightened pleading standard for fraud claims. Alternatively, BOA's motion effectively argues that Plaintiff's claims fail because evidence submitted by BOA establishes as a matter of law that certain of Plaintiff's material

allegations in the Complaint are simply false. The court considers these arguments first as they relate to Plaintiff's fraudulent misrepresentation claims in Count I and then as they relate to her fraudulent suppression claims in Count II.

### 1. Fraudulent Misrepresentation

To recover for fraudulent misrepresentation, Plaintiff would have the burden to establish the following elements: "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988).

Plaintiff's misrepresentation claims are based on three kinds of statements: (1) BOA loan representative Mayes and other, unspecified BOA "employees" falsely represented to Plaintiff on phone calls that her application documents "were 'not received,' were 'incomplete,' or were 'not current'" (Compl. ¶ 42; *see also id.* ¶¶ 43-46, 60-61, 63, 65-66, 68, 70); (2) BOA falsely told Plaintiff on or about March 20, 2011, that she had been approved for a trial period HAMP modification plan (*id*. ¶¶ 47-52, 60-61, 64-66, 69-70); and (3) on or about April 18, 2011, Mayes falsely told Plaintiff that being "past due" and in "default" on her mortgage was required to be eligible for a HAMP modification. (*Id*. ¶¶ 38-40, 60-62, 65-67, 70). As explained below, the court agrees with BOA that it is entitled to prevail on each of these claims as a matter of law, either because the allegations themselves fail to

state a claim or because evidence submitted by BOA shows that Plaintiff cannot make out one or more essential elements of claim that might have otherwise been stated.

First, the court agrees that Plaintiff has not alleged with the particularity required under Fed. R. Civ. P. 9(b) the circumstances underlying her claim based on alleged misrepresentations by Mayes and other, unspecified BOA employees on telephone calls to the effect that Plaintiff's application paperwork had not been received or was deficient in some respect. Plaintiff does not say when these statements were allegedly made; which documents were allegedly not received, were incomplete, or were not current; nor exactly how the documents were incomplete or not current or how the statements made to Plaintiff were, in fact, false. Accordingly, this claim is due to be dismissed.[5]

---

[5] The court additionally concludes that at least this fraud claim is barred by Alabama's applicable two-year statute of limitations. *See* Ala. Code § 6-2-38(l); *Kinsey v. CenturyTel*, 490 F. App'x 278, 278-79 (11th Cir. 2012); *Bryant Bank v. Talmage Kirkland & Co.*, 155 So. 3d 231, 235-36 (Ala. 2014). This claim is based on alleged misrepresentations that would have occurred between March 2010, when Plaintiff says she first applied for a HAMP modification, and February 2011, when Plaintiff received a letter from BOA advising that, based on her application, she had been deemed eligible for a HAMP modification and approved for a Trial Period Plan. (*See* Doc. 4 at 15). Plaintiff would have necessarily relied and suffered all alleged damage, *i.e.*, having to prepare and mail additional application materials, by no later than the latter date as well, February 2011. Plaintiff did not file this action in state court, however, until December 2017, well over five years later. Despite that, Plaintiff argues that all of her claims are timely under Alabama's "discovery rule," whereby the statute of limitations does not begin to run on a fraud claim until the plaintiff actually discovered the fact constituting the fraud or until such time as the plaintiff should have discovered such fact in the exercise of reasonable diligence, whichever is earlier. *See* Ala. Code § 6-2-3; *Kinsey*, 490 F. App'x at 279; *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 798 (11th Cir. 1989); *Miller v. City of Birmingham*, 235 So. 3d 220, 233 (Ala. 2017). The court disagrees. It is unclear how or when Plaintiff actually

The court concludes that BOA is entitled to summary judgment on Plaintiff's second misrepresentation claim, alleging that, on or about March 20, 2011, BOA falsely told her that she had been approved for a HAMP modification. That is so because the evidence submitted by BOA establishes that it did, in fact, approve Plaintiff both for a HAMP trial period plan and then later for a permanent HAMP modification. In other words, the record shows as a matter of law that BOA's representation in question was not false. First, BOA has furnished a letter it sent to Plaintiff, dated February 18, 2011, stating that her mortgage loan was HAMP-eligible and enclosing "Trial Period Plan" documents and coupons to make three monthly payments of $496.15, due on the first of the month in March, April, and May 2011. (Doc. 4 at 15-22). The letter further advised Plaintiff that she had to sign and return the enclosed "Trial Period Pack" by March 20, 2011, which Plaintiff appears to have done, signing and dating the paperwork on February 21, 2011. The letter stated that, after Plaintiff had completed the Trial Period Plan by

became aware that statements or omissions forming the basis of her claims were ostensibly false or otherwise fraudulent. Even so, for purposes of § 6-2-3 "discovery is made when facts become known which provoke inquiry in the mind of a man of reasonable prudence, and which, if followed up, would have led to a discovery of the fraud[.]" *Kinsey*, 490 F. App'x at 279 (*quoting Ryan v. Charles Townsend Ford, Inc.*, 409 So. 2d 784, 786 (Ala. 1981) (quotations and citations omitted)). Plaintiff insists that, even with due diligence, she could not have become aware until less than two years before she filed this action of BOA's broad "scheme" to mislead consumers and the federal government as it relates to BOA's alleged failure to comply with HAMP. But it is not necessary that Plaintiff have perfect knowledge of the fraudulent scheme in its entirety to trigger the running of the limitations period. Rather, Plaintiff certainly knew what HAMP application materials she had herself provided to BOA. As such, she was in a position to know whether BOA's statements to her asserting that those materials were deficient in some particular regard was materially false such that an investigation the matter was warranted.

timely making the three payments, BOA would send her "additional documents" that she would need to sign and return "before [her] loan will be permanently modified." The gist of Plaintiff's claim seems to be that this letter was fraudulent on the theory that, although the letter states that Plaintiff had been approved for a trial period modification plan, BOA never actually approved her for any kind of modification. However, that letter itself establishes prima face that BOA approved Plaintiff for at least a Trial Period Plan; any bald insistence to the contrary by Plaintiff is insufficient to create an issue of fact. Indeed, Plaintiff unambiguously admits that she made numerous payments throughout 2011 and 2012 under the auspices of her having been approved for that trial period plan. And insofar as Plaintiff seems to claim that she relied on BOA's representation that she had been approved for a trial period plan by making trial period payments, she fails to explain how such was detrimental given that she would have otherwise been obligated to make her regular mortgage payments instead.

To the extent Plaintiff is asserting that the trial period plan approval letter is fraudulent on the theory that it states or suggests she was approved for a *permanent* HAMP modification of her mortgage loan when she actually was not, the claim also fails. For starters, the letter simply does not state that Plaintiff had been given or would necessarily be given a permanent modification. Rather, the letter clearly states that the approval was for a trial period plan and that any permanent

modification that might be forthcoming was conditioned upon Plaintiff's

compliance with further requirements. As such, the letter does not contain the

false representation Plaintiff seems to claim it does. Equally to the point, BOA has

also presented evidence establishing that it did, in fact, grant Plaintiff a permanent

HAMP modification. That is, BOA has attached to its motion to dismiss a copy of

a "Loan Modification Agreement" that Plaintiff signed and dated on October 23,

2012, and that BOA recorded on December 9, 2013. (Doc. 4 at 23-32). Under the

terms of the instrument, Plaintiff's loan was deemed modified as of June 1, 2011,

*i.e.*, the first month after the third and final payment under her trial period plan

referenced in the February 2011 approval letter, which served as the

commencement of a new 30-year maturity period. The document further provides

that Plaintiff was due to make monthly payments of $511.39 on the first of each

month, beginning on November 1, 2012.

Plaintiff would cast that document as showing merely a "supposed

permanent modification" (Doc. 9 at 2), and she continues to argue that BOA did

not actually grant her a permanent loan modification. But, again, the "Loan

Modification Agreement" document, the authenticity of which Plaintiff does not

contest, establishes on its face that Plaintiff's BOA mortgage loan was, in fact,

permanently modified by agreement of the parties in late 2012. Plaintiff gains

nothing by pooh-poohing the parties' agreement as but a "supposed" one. Plaintiff

also contends that the two letters BOA sent to Plaintiff in January 2014 and July 2014 (Doc. 9-1), call into question BOA's claim that it granted her a permanent loan modification. They do no such thing, however. It is true that, in both letters, BOA advised Plaintiff that she had been deemed ineligible "for a loan assistance program, such as a modification, or a short sale," and the July letter stated that she was ineligible for three types of modification programs under HAMP specifically. But all that means is that BOA declined to grant Plaintiff *another* HAMP modification *in 2014*, not that the "Loan Modification Agreement" executed *in 2012* did not work a permanent HAMP modification of Plaintiff's original mortgage loan obligations, as BOA claims.[6]

The court also concludes that BOA is entitled to summary judgment on Plaintiff's third misrepresentation claim, in which she alleges that BOA loan representative Mayes advised her on a phone call, on or about April 18, 2011, that she had to be actually in "default" to be eligible for a HAMP modification. Plaintiff emphasizes that such statement was false because, under applicable federal guidelines, a "default" need only be "imminent" or "reasonably foreseeable" for a homeowner to be eligible for a HAMP modification. Plaintiff further asserts that, in reliance on Mayes's false statement, she "refrained from making her regular mortgage payment and fell into default status." (Compl. ¶ 40).

---

[6] The court notes that Plaintiff has not made any claim based on the letters BOA sent her in January and July 2014. Indeed, the Complaint makes no reference to those letters.

However, such reliance would have to be reasonable for liability to attach. *See AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207-08 (Ala. 2008). And, as explained below, any alleged intentional failure by Plaintiff's to make her monthly mortgage payments in an affirmative effort to go into default would be plainly unreasonable, on several fronts.

To begin with, by the time Plaintiff says she spoke with Mayes in April 2011, Plaintiff had already received and executed the correspondence dated February 18, 2011, in which BOA advised her she was deemed eligible for a HAMP medication and approved for a trial period modification plan, as discussed above. Given that, Plaintiff could not have reasonably believed that she would have to go into default thereafter to be eligible for a HAMP modification. In fact, while Plaintiff says that she relied on Mayes's statement by refraining making her regular monthly mortgage payments, she simultaneously asserts that, after being approved for the trial period plan, she made seventeen trial payments in 2011 and 2012, "hoping to save her home." (Compl. ¶ 50). Plaintiff makes no effort whatever to explain that discrepancy. Moreover, Plaintiff never says when she missed the mortgage payments or when she actually went into default, and she acknowledges that BOA did not foreclose on her home until December 2014, more than *three-and-a-half years* after the phone call in question. As such, it is doubtful whether her allegations are sufficient to support a plausible inference that she

actually acted in reliance on what Mayes supposedly said on the phone call.

Finally, by executing the Trial Period Plan documents in the February 2011

correspondence, Plaintiff acknowledged that HAMP modification eligibility did

not require her to be actually in default. (*See* Doc. 4 at 19 (whereby the

homeowner must certify that "(i) I am *either* in default *or*, (ii) *I do not have*

*sufficient income or access to sufficient liquid assets to make monthly mortgage*

*payments*." (emphasis added)).  Under Alabama law, Plaintiff is charged with

knowledge of the contents of those documents.  *See Alfa Life Ins. Co. v. Colza*, 159

So.3d 1240, 1249-50 (Ala. 2014).  That same correspondence also made clear that

Plaintiff had to make Trial Period Plan payments to obtain a permanent HAMP

modification.  Because the record belies Plaintiff's assertion of reasonable reliance,

BOA is entitled to summary judgment on this claim as well.

## 2. Fraudulent Suppression

Where Plaintiff contends that BOA is liable for concealing or failing to

disclose some fact, such a claim sounds in "fraudulent suppression," the elements

of which are: (1) the "defendant had a duty to duty to disclose an existing material

fact; (2) the defendant concealed or suppressed that material fact; (3) the

defendant's suppression induced the plaintiff to act or refrain from acting; and (4)

the plaintiff suffered actual damage as a proximate result."  *Cockrell v. Pruitt*, 214

So. 3d 324, 338 (Ala. 2016) (*quoting Coilplus-Alabama, Inc. v. Vann*, 53 So. 3d

898, 909 (Ala. 2010), *citing Freightliner, LLC v. Whatley Contract Carriers, LLC*, 932 So. 2d 883, 891 (Ala. 2005)).

The court discerns Plaintiff's fraudulent suppression claims to be founded on the following allegations: (1) that BOA failed to disclose that it never intended to approve Plaintiff for a HAMP modification (Compl. ¶¶ 47, 55); (2) that Mayes omitted, in her April 18, 2011, phone call, the fact that a homeowner could be eligible for a HAMP modification so long as a default was merely "imminent" or "reasonably foreseeable," not just if a default had already occurred (*id.* ¶¶ 38-40); (3) that BOA failed to disclose that it would retain Trial Period Plan payments in an unapplied account rather than apply them to her loan balance while BOA made a decision on whether to grant a permanent modification (*id.* ¶ 48, 49, 50, 51, 52); and (4) that BOA failed to disclose that it was "conducting unnecessary and improper inspections" and charging her account "impermissible" inspection fees from out of her Trial Period Plan payments. (Compl. ¶¶ 53-58, 72-78).

Taking those theories in order, the court first concludes that BOA is entitled to summary judgment on the claim alleging that BOA fraudulently suppressed that it never intended to review Plaintiff's HAMP modification application in good faith or never intended to grant her a HAMP modification of her mortgage loan. As previously explained, the Trial Period Plan correspondence Plaintiff received and executed in February 2011 and the Loan Modification Agreement she signed

in October 2012 establish as a matter of law that BOA did, in fact, review and approve her HAMP modification application and later grant her a permanent modification. As such, these fraud claims are factually groundless.

BOA is likewise entitled to summary judgment on Plaintiff's claim that, when Mayes spoke to Plaintiff on a phone call in April 2011, Mayes fraudulently failed to disclose that a homeowner may be eligible for a HAMP modification if a default is merely "imminent" or "reasonably foreseeable," not just when a default has already occurred. This claim fails for the same reasons as did Plaintiff's related claim alleging that Mayes fraudulently misrepresented affirmatively that eligibility requires an actual default. That is, like the misrepresentation claim, Plaintiff's suppression claim also requires a showing both that BOA's non-disclosure caused Plaintiff to act to her detriment and that such reliance was reasonable under the circumstances. *See Johnson v. Sorensen*, 914 So. 2d 830, 837 (Ala. 2005). Plaintiff claims she relied on Mayes's putative misrepresentation (that an actual default was required) and omission (that an imminent default could suffice) by intentionally failing to make monthly mortgage payments after the phone call in a deliberate effort to go into default, so that BOA might deem her eligible for a HAMP modification. But, again, Plaintiff does not allege when she missed the mortgage payments, and she acknowledges that BOA did not foreclose until December 2014, seriously undercutting the notion that she acted in reliance

on what Mayes said or didn't say in April 2011. Moreover, Plaintiff has *simultaneously* claimed that she "relied" on BOA's representation in the February 2011 correspondence that she was approved for a Trial Period Plan by *making* 17 payments "in 2011 and 2012" "in an effort to save her home." Again, Plaintiff makes no attempt to explain that contradiction. And in any event, any intentional failure by Plaintiff to pay her mortgage would be unreasonable reliance as a matter of law given that, by the time of the April 2011 phone call, (1) Plaintiff had already received the February 2011 letter from BOA deeming her eligible for a HAMP modification and approving her for a Trial Period Plan, belying that she need to go into default thereafter to be eligible; (2) the Trial Period Plan enclosed with that approval letter fairly states that Plaintiff could be eligible for a modification if she was "*either* in default" "*or*" that she did "not have sufficient income or … liquid assets to make [her] monthly mortgage payments" (Doc. 4 at 19 (emphasis added), *i.e.*, that a default was reasonably foreseeable; and (3) that same enclosure makes clear that, to obtain a HAMP modification, Plaintiff had to make her Trial Period Plan payments. This claim is due to be dismissed.

Next, Plaintiff claims that, when BOA asked her to make payments under a Trial Period Plan, BOA fraudulently failed to disclose that such amounts would be kept in an unapplied account rather than be applied to her loan balance while BOA made a decision on whether to grant her a permanent modification. The allegation

underlying that claim, however, has also been proven false by the Trial Period Plan documents Plaintiff received and executed in February 2011. That is, those documents explain that payments received by BOA under the Trial Period Plan would be held by BOA "in a suspense account" until the homeowner "successfully complete[s] the Plan," whereupon the funds would then be credited to the homeowner's regular account balance. (Doc. 4 at 20, ¶ C). The Trial Period Plan payment funds would also be so applied, the document says, if the Trial Period "Plan is canceled and/or terminated for any reason." (*Id.*) Thus, the record shows BOA did not fail to disclose the fact at issue. In addition, while Plaintiff claims that she relied on this alleged suppression by making 17 payments under the Trial Period Plan in 2011 and 2012, she does not specifically and plausibly allege how such reliance was to her detriment given she would have otherwise been obligated to make her regular monthly mortgage payments. BOA is entitled to summary judgment on this claim as well.

In her final claim, Plaintiff contends BOA is liable because, when it asked her to make Trial Period Plan payments, it failed to disclose that it was "conducting unnecessary and improper inspections" and would charge her account "impermissible" inspection fees from out of those payments. This claim is due to be dismissed for failure to state a claim. At the outset, the court would note that the Trial Period Plan documents do, in fact, alert Plaintiff generally to the fact that

portions of those payments might eventually be used to pay unspecified "fees due" on her BOA mortgage account. (*See* Doc. 4 at 20, ¶ 2(C)). But more to the point, while Plaintiff alleges that BOA charged fees on her account from 2004 to 2015 for twelve inspections that occurred while she was living in the home, she does not sufficiently identify how those inspections or fees were actually *unlawful*. Merely labeling them as "impermissible," "unnecessary," "improper," and "fraudulent," as Plaintiff repeatedly does, is to do no more than assert legal conclusions entitled to no credit. It is true that Count II quotes from three HUD Servicing Guidelines related to property inspections (Compl. ¶¶ 73-75), with the apparent implication being that such provision were violated by BOA's inspections of Plaintiff's property. The problem for Plaintiff is that she wholly fails to allege *facts* sufficient from which to infer that any BOA inspection or fee charged was, in fact, inconsistent with the terms of any of those HUD Guidelines. On top of that, Plaintiff fails to allege facts plausibly showing how any reliance on her part, was *detrimental*. That is Plaintiff again conceives her reliance as her having agreed to the Trial Period Plan and then making 17 payments thereunder in 2011 and 2012. However, if Plaintiff did not agree to the Trial Period Plan, she would have still been legally obligated to make her monthly mortgage payments in any event, and she makes no claim to the effect that the inspection fees were not chargeable out of

her regular monthly payments just the same.  BOA's motion to dismiss is thus due to be granted on this claim.

## IV.    CONCLUSION

BOA's motion to dismiss (Doc. 4), treated as a motion to dismiss or, in the alternative, for summary judgment is due to be granted, as set forth herein. Accordingly, this action is due to be dismissed with prejudice.  A separate final order will be entered.

**DATED**, this 28th day of August, 2018.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge